# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | | |
|---|---|---|---|
| TROY LOVE, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:19-CV-446-RLJ-DCP |
| | ) | | |
| BERT C. BOYD, WARDEN, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## MEMORANDUM OPINION

Petitioner Troy Love ("Petitioner"), a Tennessee inmate proceeding pro se, has filed a federal habeas petition pursuant to 28 U.S.C. § 2254 challenging his confinement under State-court judgments of convictions for two counts of rape of a child. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds that the petition should be denied.

## I.   SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals ("TCCA") summarized the facts of this case as follows:

> The [Petitioner]'s convictions relate to sexual abuse of his step-great-granddaughter. At the trial, the victim, who was nine years old at the time of the trial, testified that she knew the difference between a good touch, such as a hug, and a bad touch, which she described as "someone's touching you in a part you don't like." She said bad touches had occurred when the [Petitioner] touched her "private parts" and her "butt" with his fingers and his mouth. Using a diagram of a female and a male child, she identified the areas corresponding to the "private" and "butt." She said the touching began when she was six years old and continued until she was eight. She said it occurred in the [Petitioner]'s living room and bedroom.
>
> Relative to an incident in the [Petitioner]'s bedroom, the victim testified that as she watched television, the Defendant came into the room, went under the sheets, and touched her "private" with his mouth. She said the [Petitioner]'s actions made her sad.

Relative to an incident in the [Petitioner]'s living room, the victim testified that as she napped on the couch, the [Petitioner] came to the couch where she was sitting, that she moved to the end of the couch, and that the [Petitioner] touched her private with his finger and his mouth. She thought she was in second grade when this incident occurred.

Relative to an incident in the movie room at her old house, the victim testified that she sat on the couch, wore "footsies," and watched a movie. She said the [Petitioner] unzipped her clothing and touched her private with his finger. She said his finger did not go inside her.

When asked whether the [Petitioner] touched her privates on any other occasions, the victim said he did not. She said the [Petitioner] never put anything, including his finger or his private, in her private. She likewise stated that she could not recall any other incidents in which he touched her body with other parts of his body.

The victim testified that the [Petitioner]'s wife had passed away, that she had spent a lot of time with the [Petitioner] and his wife, and that she visited frequently at their house. She said she called the [Petitioner] "Troy."

The victim testified that when she was in second grade, her mother and her grandmother took her to a place with a Wii gaming system and that she talked to a woman and made drawings with her. She said she told the truth to the woman and did not tell her anything that was not true. She said her mother and grandmother were not in the room when the woman talked to her. She recalled the woman's stating that video cameras were recording what happened. She agreed she told the woman that her "grandpa" had touched her in places she did not like. She agreed she told the woman the incidents began after the Friday on which the victim had her tonsils removed. She agreed that the incident she described in the [Petitioner]'s bedroom occurred on the Sunday after her tonsils were removed and that she had told the woman who interviewed her that she had asked to go to the [Petitioner]'s house that day. She agreed she had told the woman that she went home on Monday and told her mother on Tuesday about the touching. She agreed that the woman drew a timeline based on the interview, and the timeline was received as an exhibit.

The victim testified that she did not remember the woman asking her if the [Petitioner] ever put his private in her private. After reviewing a portion of the video recording outside the presence of the jury, the victim testified that watching a video recording had helped her remember what she said. She said she told the woman the [Petitioner] had put his private in her private. She did not recall if the woman asked how the victim's body felt when the [Petitioner] did this, but she later said she remembered telling the woman her body felt tingly after the [Petitioner] put his private in her private. She remembered telling the woman that the [Petitioner] lay on top of her when he put his private in her private. She recalled telling the woman that the [Petitioner] did not have to do anything to his private part before putting it inside her and that it was inside her, not just close to her private part. She

remembered telling the woman that she was five years old the first time the [Petitioner] put his private part in her private part. She recalled telling the woman that the [Petitioner] put his private part in hers seven or eight times and that she never saw the [Petitioner]'s private part. The victim recalled telling the woman that she did not remember how the [Petitioner]'s private part felt.

The victim identified a drawing she made for the woman who interviewed her, and it was received as an exhibit. She recalled telling the woman that the drawing showed "where the pee comes out of." She recalled telling the woman that when she went to the bathroom "that night," she saw something that looked like "boogers" in the part of her underwear that "went under her private."

The victim acknowledged that she had testified that the [Petitioner] did not put his finger in her private. She remembered telling the woman who interviewed her that the [Petitioner] had put his finger in her private, and she recalled showing the woman what the [Petitioner] did with his finger but did not recall what she had done.

The victim testified that she had her tonsils removed when she was seven and one-half years old and that she told her mother about the abuse after she had her tonsils removed. She said she told "Jessica" about the abuse before she told her mother. She did not recall what she told the woman who interviewed her when the woman asked why the victim told Jessica about the abuse.
The victim acknowledged her previous testimony that she did not remember what she told the woman who interviewed her about what the [Petitioner] did with his finger inside the victim and said that watching the video recording had not helped her remember. A portion of the recording was played for the jury, and the court noted that it pertained to "this question that [the prosecutor] just asked [the victim]." The court instructed the jury that its consideration of the recording was limited to matters concerning the victim's credibility and was not to be considered as substantive evidence.

The victim testified that after viewing the recording, she recalled why she decided to tell Jessica about the abuse. The victim said she told the woman who interviewed her that she told Jessica because it was something important. The victim acknowledged that in the recording, she told the woman that she and Jessica had talked about their favorite people and that the victim had said her "uncle" was her favorite person because he had touched her "in the bad spots." The victim testified that no one other than the [Petitioner] had touched her in "private spots."

Knox County Sheriff's Detective Miranda Spangler testified that she spoke by telephone with the victim's mother on January 14, 2013. She said she met with the victim's mother and the victim's grandmother and conducted a brief interview of the victim's mother. Detective Spangler said she asked the victim's mother to participate in a "one-party-consent call" with the [Petitioner], which Detective Spangler said involved a person making a telephone call with a detective guiding

what the person said. Detective Spangler said the person who made the call would know that the call was being recorded but the recipient would not.

Detective Spangler testified that the victim's mother made multiple one-party-consent calls to the [Petitioner]. Detective Spangler said that because the victim's mother had blocked the [Petitioner]'s telephone number on the victim's mother's cell phone, the victim's mother used the victim's grandmother's cell phone to make the calls. Detective Spangler said the [Petitioner] initially answered calls but eventually stopped answering.

Detective Spangler agreed that a friend or family member, rather than a police officer, was used for one-party-consent calls because the call's recipient might be more willing to talk to the person making the call. Detective Spangler agreed that she gave the victim's mother some instructions about what to say. She said that she listened to what suspects said in one-party-consent calls and that she sometimes advised callers about what to say in order to keep the suspects talking. She agreed that she told the victim's mother to tell the [Petitioner] he owed it to her to talk about what happened with the victim.

The January 14, 2013 recording of the calls was played for the jury and reflects the following: A call was placed, and a message was received stating that the caller was not authorized to call the number. In the second call, the victim's mother identified herself to the [Petitioner] and asked why he "did this" to the victim. The [Petitioner]'s response is unintelligible. The victim's mother stated she wanted to know what he did to the victim, and the [Petitioner] responded that he could not talk about it now. The victim's mother stated that he had no choice. The victim's mother stated that the [Petitioner] hung up. In a third call, the victim's mother told the [Petitioner] that he owed it to the victim's mother and the victim to tell the victim's mother why he had done "this." She stated that the [Petitioner] hung up again. In a fourth call, the victim's mother told the [Petitioner] to quit hanging up and stated he had to talk to her about "this." She stated he owed it to her and her daughter, who had loved and trusted him. The [Petitioner] stated, "I know, honey. I didn't mean to do it." He said, "I gave in, and I shouldn't have." The [Petitioner] stated that he was depressed, that he did not know why he did it, that it was horrible, and that he wished he were dead. The victim's mother stated that the victim said the [Petitioner] "put something in her" and asked what he put in the victim. The [Petitioner] repeated, "that I put something in her." The victim's mother asked what he did and then stated that the [Petitioner] hung up. Fifth and sixth calls were placed, and a voicemail message began playing in both. Following discussion about making a call from a different telephone number, a seventh call was placed, which reached a voicemail recording. Between the calls, the victim's mother talked to Detective Spangler and Travis Bishop, an employee of the Department of Children's Services, about how the victim's mother should proceed in speaking to the [Petitioner].

Detective Spangler testified that on January 14, 2013, a forensic interview of the victim occurred at Child Help. Detective Spangler said that they located the [Petitioner] because the victim's mother, who paid for the [Petitioner]'s cell phone service, placed a tracking device on his cell phone. Detective Spangler said she, Detective Faulkner, and Mr. Bishop followed the [Petitioner] from a business to the [Petitioner]'s home with information from the tracking device.

A voicemail message that the [Petitioner] left for Detective Spangler on January 22, 2013 was played. In it, the [Petitioner] stated that he was calling Detective Spangler in response to her questions about allegations of sexual abuse of the victim. He stated that he was impotent and unable to have sex and that he had been unable to have sex with his wife before her death. He stated that he had "issues" with the victim and that she had a history of lying. He stated that the victim had told him she had sex with two boys but that she would not tell him the boys' names. He stated that the victim had "issues" with "sexual things" and "honesty and telling the truth." He said the victim told him that she had seen her father and stepmother engaged in sexual activity. He said the victim had stolen $120 from his wallet, which was inside a drawer.

Detective Spangler testified that after she received this voice mail message, she gathered her information and gave it to the district attorney's office. She said that after the grand jury returned an indictment, she checked with the victim's mother about the cell phone tracking information relative to the [Petitioner]'s location and that he was arrested in Battle Creek, Michigan based on that information. She acknowledged that the victim's grandmother had told her previously that the [Petitioner] was from Michigan, had family there, and would go there if he left Tennessee.

Detective Spangler agreed that after the forensic interview, she had the victim's grandmother attempt to make a one-way-consent call but that the [Petitioner] did not answer. Detective Spangler agreed that she made arrangements for the victim's grandmother to make another one-way-consent call later that day, although she ultimately told the victim's grandmother not to make the call after receiving advice from the prosecutor. Detective Spangler agreed that on the morning of January 14, 2013, the victim's grandmother told her that the [Petitioner] left a voice mail message in which he said he wanted to talk to the victim's grandmother about something important.

Relative to the victim's forensic interview at Child Help, Detective Spangler testified that in a forensic interview, a child was alone with a trained interviewer who was not biased and did not ask leading questions. She said she and Mr. Bishop watched the interview. She agreed that the victim first made allegations against the [Petitioner] on January 8, 2013, and that the forensic interview occurred on January 13. She agreed that after watching the forensic interview, she and Mr. Bishop talked to the victim's mother and the victim's grandmother to see if the victim's account

5

could be corroborated and noted that children are not good with "their times, their timeline."

The victim's grandmother testified that the [Petitioner] was her stepfather and that her mother had passed away from hip replacement complications in 2012.

The victim's grandmother testified that the [Petitioner]'s abuse of the victim came to light on January 8, 2013, when the victim told her babysitter, Jessica, about it. The victim's grandmother said the babysitter notified the victim's mother, who notified the victim's grandmother. The victim's grandmother said she called the [Petitioner] on the day the victim revealed the abuse and asked him about the allegations, but he said he was at work and could not talk. She said that she received a voicemail message to call the [Petitioner] and that they talked. She said he left messages for her on January 8 and January 14.

A voicemail message that the [Petitioner] left for the victim's grandmother on January 8, 2013 was played. In it, the [Petitioner] stated that he wanted to talk to her about what she called about earlier that day. The [Petitioner] stated that he had not wanted to talk around others earlier and that he did not have sex with the victim "or anything like that." He stated that the victim "makes up stories" and that she had told him she had had boyfriends and had sex but that he had not believed her. He said he had asked the victim to identify her boyfriends but that she did not. He said he thought the victim exaggerated things. He said he and the victim wrestled but did not do anything sexual.

The victim's grandmother testified that she called the [Petitioner] after she received the preceding voicemail message and asked what was going on and why the victim made the allegations. She said he stated that he did not know, that he had been depressed, that he was sorry, and that if the victim's family did not notify the police, he would leave town and they would never see him again. She said the [Petitioner] stated that he could not go to jail and would rather die. She said the [Petitioner] put his house on the market and left town within three weeks to one month. She agreed that she told Detective Spangler she had the ability to see the [Petitioner]'s cell phone records because she paid for his service and thought she told Detective Spangler that she had not seen any calls from the [Petitioner] to his relatives in Michigan between January 8 and January 14, 2013. After reviewing a recording outside the presence of the jury, the victim's grandmother agreed that at Detective Spangler's direction on January 14, she attempted to make a one-party-consent call to the [Petitioner] after the calls placed by the victim's mother.

The victim's grandmother agreed that the victim's tonsils were removed around the time the victim first made the allegations on January 8, 2013. The victim's grandmother agreed that the victim was emotional. The victim's grandmother agreed that she told Detective Spangler and Mr. Bishop that the victim had not seemed like anything was wrong immediately after the last time the victim spent the night at the [Petitioner]'s house. The victim's grandmother thought it was

6

unusual that the [Petitioner] dropped off the victim without checking to see if the victim's grandmother was home but acknowledged she did not know if her son, who lived with her, had been home. She said her husband had been at work on this occasion. After reviewing a recording outside the presence of the jury, the victim's grandmother agreed that the last time the victim spent the night at the [Petitioner]'s house was "right when they got out for Christmas break." When asked whether it could have been on Christmas Eve, the victim's grandmother could not recall the date but stated it would not have been unusual for the victim to have spent the night away from home on Christmas Eve because the family was of the Jehovah's Witness faith and did not celebrate Christmas. The victim's grandmother agreed that she did not know every time the victim spent the night at the [Petitioner]'s house.

The victim's grandmother testified that her sister was married, that the [Petitioner] lived with the sister, and that the victim sometimes spent the night at the sister's house. The victim's grandmother said the victim had never stated that anyone other than the [Petitioner] touched her inappropriately.

At the close of the State's proof, the trial court granted a motion for judgment of acquittal for counts three and four of the indictment, which alleged rape of a child by vaginal/oral penetration and vaginal/digital penetration, respectively. The remaining counts for the jury's consideration consisted of counts one and two, each alleging rape of a child by vaginal/oral penetration, related to an act at the [Petitioner]'s house on his bed and to an act on the couch in the [Petitioner]'s living room, respectively, and count eight, alleging aggravated sexual battery by vaginal/digital contact, related to an act in the movie room of the victim's old house.

The victim's mother testified as a defense witness that the victim never told her "completely" about the allegations. The victim's mother said the victim had not had any contact with the [Petitioner] since making the allegations.

The victim's mother testified that the victim's tonsils were removed on January 4, 2013. The victim's mother said that following the surgery, the victim stayed primarily with the victim's mother and "Jessica." She said the victim did not stay with the [Petitioner] after the victim's tonsils were removed. The victim's mother said the victim never stated that anyone other than the [Petitioner] touched the victim.

The victim's mother testified that she did not know of a time when the victim suddenly had $120 in cash. When asked if she would know if the victim had $120, the victim's mother said she would not.

The [Petitioner] testified that he did not commit the acts to which the victim testified. He denied putting anything inside the victim. He denied touching her inappropriately. The [Petitioner] stated that he, his wife, and his two stepdaughters moved from Michigan to Tennessee in 1980. He said that he lived in Knoxville for

7

thirty-three years, until 2013, during which time he worked as a housepainter. He said that, aside from the present charges, he had never been arrested, convicted of a crime, or accused of anything similar.

The [Petitioner] testified that his wife died on June 5, 2012, from hip surgery complications. He said that they had been married for thirty-three years, that her death was unexpected, that he was depressed afterward, and that it took him a long time to get over her death. He said he had financial difficulty after her death, that he had to sell his car, and that he was facing foreclosure of his home mortgage. He said he had been unable to find work in Knoxville.

The [Petitioner] testified that he had been impotent since shortly before his wife's death. He said he did not seek medical treatment because he had been busy taking care of her and trying to make a living. He said he did not seek treatment after her death because he was depressed and "wasn't worried about that kind of thing." He said he was not thinking about having sex with anyone at that time.

The [Petitioner] testified that the victim grew up with him as her great-grandfather, that they were close, and that he had taken her and her brother fishing. He said she last stayed overnight at his house in December 2012. He said that it was not unusual for the victim to spend the night at his house and that the victim and her brother stayed there. Relative to the victim's last overnight visit, he said that he slept in his bed upstairs and that she slept downstairs on the couch. He said that the victim never came into his bedroom that night, that they would have watched television or movies in the living room, and that he never "went downstairs to the couch" that night. He denied putting his mouth on her vagina that night. He said that the next day, he took her to visit her cousins and then took her to her grandmother's house. He said he "took her up to the house" and would not have left her if no one had been home, but he did not recall who had been home.

The [Petitioner] recalled that he received a telephone call from the victim's grandmother on January 8, 2013, regarding allegations the victim made against him. He said he had been at work and unable to talk about personal matters and that he returned her call later. He said he denied the allegations in a voice message he left for the victim's grandmother "[b]ecause it didn't happen." He did not recall having a January 14 conversation with the victim's grandmother in which he said he would rather die than go to jail. He said that he received six or seven "harassing-type" calls on January 14, in which the unidentified callers wanted him to admit wrongdoing. He said he was angry and kept hanging up. The [Petitioner] denied that he called the victim's mother and "basically admitted" the victim's allegations and that he said he would "disappear." He denied saying he would rather be dead than incarcerated and said the victim and the victim's mother lied in their testimony when they said otherwise.

The [Petitioner] addressed the January 14, 2013 telephone call, a recording of which was played during the State's case-in-chief. Regarding his statements in the

call that he did not mean to do it, that he gave in, and that he should not have given in, he said he meant it as an apology for not having told the victim's mother about the victim's having said to him that she had sex with two boyfriends. He said the victim also stated she had seen her mother and stepfather having sex. He said that he had not told the victim's mother because he had not believed the victim and stated that the victim was "having issues" and had stolen $120 from his wallet. He said he regretted not telling the victim's mother about what the victim had said because if he had told her, she "maybe ... wouldn't have been telling lies about" him. When asked if his statements were in reference to having touched the victim or put his mouth on her vagina, he responded, "Of course not." He said he had stated he wished he were dead because everything in his life was going wrong. He noted his wife's death, his financial problems, his unemployment, the victim's accusations, and his family's disowning him. He said he felt like his "life was a hell." He said he had not wished he was dead because he had put his mouth on the victim's vagina or touched her inappropriately. The [Petitioner] acknowledged, however, that his response about not having meant to do it, having given in, and that he should not have given in had been in response to the victim's mother's question asking why he had "done this" to the victim. He acknowledged his apology had been vague. He also acknowledged that he knew the victim had made sexual allegations against him when he said it. He did not recall stating in the telephone calls that he was weak but agreed that if the recording reflected he had said it, he did.

The [Petitioner] testified that he did not have anywhere to stay in Knoxville in February 2013 and that none of his family in Knoxville was speaking to him. He said he went to Michigan to be with family, have a place to stay, and look for work. He said that in Michigan, he was able to stay with his brother and that he found work. He said he leased his Knoxville house to someone who was eventually able to obtain a mortgage and purchase it.

The [Petitioner] agreed that he had raised the victim's grandmother, who was his stepdaughter, and that they were close and trusted each other at the time the victim made the allegations.

*State v. Love*, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *1-7 (Tenn. Crim. App. Mar. 21, 20017), *perm. app. denied* (Tenn. July 20, 2017) ("*Love I*").

Petitioner was indicted by a Knox County Grand Jury on seven counts of rape of a child and two counts of aggravated sexual battery [Doc. 19-1 p. 8-11]. Prior to trial, Petitioner filed a motion to suppress evidence of recorded phone calls between himself and the victim's mother [*Id.*

at 35-37; Doc. 19-2 p. 2-9]. The trial court denied the motion [Doc. 19-1 p. 39], and Petitioner proceeded to trial.[1]

After the conclusion of the State's proof, the trial court granted Petitioner's motion for judgment of acquittal for two counts of rape of a child [Doc. 19-7 p. 96]. The jury subsequently convicted Petitioner of two counts or rape of a child and one count of aggravated sexual battery [Doc. 19-2 p. 70-72].[2] The trial court imposed consecutive twenty-five-year sentences for the child rape convictions, to run concurrently with a ten-year sentence for the aggravated sexual battery conviction, resulting in an effective fifty-year sentence of imprisonment [*Id.*].

On direct appeal, the TCCA affirmed Petitioner's convictions and sentences for child rape but reversed his conviction for aggravated sexual battery due to an erroneous jury instruction.[3] *Love I*, 2017 WL 1077062, at *20-22, 26. The Tennessee Supreme Court denied discretionary review [Doc. 19-20].

Thereafter, Petitioner filed a pro se petition for post-conviction relief [Doc. 19-21 p. 4-14]. The post-conviction conviction court appointed counsel, who then filed an amended petition on Petitioner's behalf [*Id.* at 56-59]. Following an evidentiary hearing, the post-conviction court denied relief [*Id.* at 63-67].[4]

---

[1] Prior to trial, the trial court granted the State's motion to dismiss three counts of rape of a child and one count of aggravated sexual battery [Doc. 19-2 p. 53].

[2] The jury found Petitioner guilty of rape of a child for penetration occurring on Petitioner's bed, and for penetration occurring on the couch in his living room. *Love I*, 2017 WL 1077062, at *7.

[3] The charge of aggravated sexual battery was apparently subsequently dismissed [Doc. 1 p. 3].

[4] Petitioner did not present proof at the evidentiary hearing, but instead relied on transcripts and counsel's arguments in support of his claim.

10

Aggrieved, Petitioner appealed [Doc. 19-23]. The TCCA affirmed the denial of post-conviction relief. *Love v. State*, E2019-00111-CCA-R3-PC, 2019 WL 4891265, at *1 (Tenn. Crim. App. Oct. 3, 2019), *perm. app. denied* (Tenn. Jan. 16, 2020) ("*Love II*"). The Tennessee Supreme Court denied discretionary review [Doc. 19-29].

On or about November 6, 2019, Petitioner filed the instant petition, raising the following grounds for relief, as paraphrased by the Court:

| | |
|---|---|
| Ground One: | Ineffective assistance of trial counsel |
| | a. Failure to call as a witness the person who interviewed the victim; and |
| | b. Failure to request that the trial court play the entire forensic interview of the victim |
| Ground Two: | State's failure to correct the false testimony of the victim |
| Ground Three: | False testimony by victim |
| Ground Four: | Error in denying Petitioner's motion to suppress evidence the recorded phone calls between Petitioner and the victim's mother |

[Doc. 1]. The Court ordered Respondent to respond to the petition [Doc. 12]. Respondent complied by filing an answer on April 1, 2020 [Doc. 22]. Petitioner submitted a reply to the answer on or about April 15, 2020 [Doc. 23]. This matter is ripe for review.

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id*. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S.

12

722, 729, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the State's procedural rules, or that his trial counsel rendered ineffective assistance. *See Coleman*, 501 U.S. at 753. Additionally, the prejudice demonstrated to overcome the default must be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions") (emphasis in original). A fundamental miscarriage of justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## III. DISCUSSION

### A. Procedurally Defaulted Claims

#### 1. Ineffective Assistance of Counsel

Petitioner maintains that counsel rendered ineffective assistance of counsel: (1) in failing to call forensic interviewer Nicole Batara as a witness; and (2) in failing to request that the trial court play the victim's entire forensic interview for the jury [Doc. 1 p. 10-16].

Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally

deficient performance, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Id.* Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687-88. A reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the State-court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a State court, a petitioner "must demonstrate that it was necessarily unreasonable" for the State court to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

Petitioner's federal habeas ineffective assistance of trial counsel claims have never been presented to the TCCA, as is required to meet the exhaustion requirement of 28 U.S.C. § 2254(b). *See Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003) (finding presentation of claim to TCCA

sufficient to exhaust state remedies); *see also* Tenn. S. Ct. R. 39 (establishing presentation of claim

to TCCA is sufficient to exhaust state remedies). The Court notes that Petitioner argues that he

raised a post-conviction claim that counsel rendered ineffective assistance in failing to call forensic

interviewer Nicole Batara as a witness. However, in his pro se petition for post-conviction relief,

he raised the claim as a failure to investigate by counsel, not a failure to qualify her or call her as

a witness [Doc. 19-21 p. 7]. A federal habeas petitioner must present the state courts with "the

same claim under the same theory" as is presented in federal court to meet the exhaustion

requirement. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) (citation omitted).

Regardless, assuming that Petitioner's habeas claim had been presented under the same

theory to the State courts, by failing to pursue the claim on post-conviction appeal, Petitioner failed

to fully exhaust it. *See O'Sullivan*, 526 U.S. at 845 (holding that proper exhaustion requires

petitioner to pursue claim through "one complete round of the State's established appellate review

process").[5] Accordingly, this claim is technically exhausted but procedurally defaulted. *See Atkins*

*v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) ("[W]hen a petitioner fails to present a claim in

state court, but that remedy is no longer available to him, the claim is technically exhausted, yet

---

[5] Petitioner argues that any default should now be excused, because the trial court failed to address the issue. However, Petitioner was appointed counsel, who filed an amended petition that did not incorporate the pro se petition. Amended petitions generally supersede original ones unless a "party evinces an intent for the amended pleading to supplement rather than supersede the original pleading, . . . and where a party is forced to amend a pleading by court order." *Braden v. United States*, 817 F.3d 926, 930 (6th Cir. 2016) (citation and internal citations omitted); *see also Garrett v. Mays*, 777 F. App'x 816, 818 (6th Cir. 2019) (finding amended petition filed by counsel does not supersede prior pro se petition where amended petition evinced an intent to supplement, rather than replace, the original petition). The Court also notes that at the hearing on the post-conviction motion, Petitioner was present and did not object or complain to the Court when counsel argued only one claim of ineffective assistance based on trial counsel's introduction the victim's forensic interview statements on cross-examination [Doc. 19-22 p. 3-13].

procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

Generally, the ineffective assistance of post-conviction counsel cannot serve as cause for a procedural default. *Coleman*, 501 U.S. at 754. The Supreme Court altered the general rule in *Martinez v. Ryan*, holding that a substantial claim of "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. 1, 9, 14 (2012). However, the rule in *Martinez* "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings[.]" *Id*. at 16. Thus, *Martinez* does not apply to a claim of ineffective assistance of trial counsel raised in the initial-review collateral stages but defaulted on appeal. *See Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals"); *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015) (stating that *Martinez* does not apply to a claim the petitioner raised in the initial review post-conviction proceeding but failed to preserve on appeal). Therefore, any alleged ineffectiveness of post-conviction counsel cannot serve as cause to excuse the default of Petitioner's claim as to Batara.

However, even if *Martinez* were applicable to Petitioner's claim regarding Batara, Petitioner's assertions that her testimony would have undermined the victim's credibility and that her professional qualifications could have been questioned is wholly speculative and devoid of any evidentiary support. Therefore, they cannot serve as the basis for a substantial claim of ineffective assistance of counsel.

As to Petitioner's claim that counsel was ineffective in failing to request the trial court play the entire forensic interview for the jury, the *Martinez* exception is potentially applicable, as this claim has never been presented to the State courts. However, a petitioner seeking to use this exception to overcome a default "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14 (citation omitted). The record shows that trial counsel made a strategic decision to only introduce certain portions of the victim's video to impeach the victim's testimony. *Love II*, 2019 WL 4891265, at *8.[6] Furthermore, even if counsel had moved to introduce the whole video, the trial court likely would have overruled the request, as the court appeared to agree with the prosecutor's observation that "playing the entirety of a forensic interview. . . for impeachment is reversible error" [Doc. 19-6 p. 99].[7] When the prosecutor later moved to admit the video in its entirety, the trial court determined that it was not appropriate to play the whole video [*Id*. at 93, 99]. Therefore, any effort from trial counsel to admit the entire video would have been unsuccessful, and counsel did not perform ineffectively in failing to make a motion to do so. *See, e.g., Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010) (finding counsel cannot be held constitutionally ineffective for failing to pursue meritless claim or raise a meritless objection).

Accordingly, the Court concludes that Petitioner has not shown that these ineffective assistance claims are substantial, and he cannot show any cause and prejudice to excuse the default of these claims. *See Martinez*, 566 U.S. at 14 (holding petition must show claim is substantial and

---

[6] Petitioner's current claim is counter to the claim rejected on post-conviction appeal, where he argued that trial counsel should not have attempted to introduce any portions of the forensic interview [Doc. 19-23 p. 9-11].

post-conviction counsel was ineffective in failing to raise the ineffective assistance of trial counsel claim in order to excuse procedural default). Accordingly, they will be dismissed.

### 2. False Testimony

Petitioner maintains that the victim, her mother, and her grandmother testified falsely, and that the State failed its obligation to correct the false testimony [Doc. 1 p. 12-14, 27]. These claims were not presented in State court, and Petitioner has no remedies available to raise the claims. *See* Tenn. R. App. P. 4(a); Tenn. Code Ann. §§ 40-30-102(a), (c), 106(g). Therefore, the claims are technically exhausted but procedurally defaulted. *See Atkins*, 792 F.3d at 657. Plaintiff makes no showing of causing and prejudice to excuse the default.

Nonetheless, out of an abundance of caution, the Court considers the merits of this claim. This claim is premised on Petitioner's assertion that the victim, her mother, and her grandmother, all testified falsely when each stated that the victim had never accused anyone else of touching her inappropriately, as she stated in her forensic interview that her uncle had been touching her "in the bad spots" [*See* Doc. 19-6 p. 98, 101]. The Supreme Court has held that the "State may not knowingly use false evidence, including false testimony, to obtain" a conviction. *Naupe v. Illinois*, 360 U.S. 264, 269 (1959). "A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury[.]'" *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Therefore, to prevail on such a claim, "a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz*, 568 F.3d at 583-84.

Here, Petitioner is conflating a prior inconsistent statement with a demonstrably false one. At trial, the victim testified that no one except Petitioner had touched her in her private area [Doc. 19-6 p. 102]. The victim was questioned about her statement on cross-examination, and she

18

admitted that she had stated in the video that her uncle had been touching her "in the bad spots" [*Id*. at 101]. This exploration through cross-examination was the proper means of addressing the inconsistency. *See, e.g., United States v. Miller*, 59 F.3d 417, 423 (3rd Cir. 1995) (explaining inconsistent statement is not necessarily perjury, and that such an issue is properly addressed on cross-examination); *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007) (finding no due process violation where witness "told different stories" that were known to defense counsel and trial testimony subject to cross-examination). Accordingly, Petitioner has not demonstrated that false testimony was given at his trial, or, consequently, that the prosecution knew any such statements were false. Accordingly, he is not entitled to federal habeas relief, and this claim will be dismissed.

### B. Motion to Suppress

Petitioner also argues that the trial court should have suppressed evidence of telephone calls between himself and the victim's mother [Doc. 1 p. 19-22]. In reviewing this claim on direct appeal, the TCCA explained that "suspects whose trusted confidant records or transmits their conversations, which the State later relies upon in a criminal prosecution, are afforded no constitutional protection relative to a voluntary statement of the confidant." *Love I*, 2017 WL 1077062, at *9 (citing *State v. Sanders*, 452 S.W.3d 300, 314 (Tenn. 2014)). The "key inquiry" is not the involvement of the police, but rather, the fact question of "whether the inculpatory statement was made voluntarily." *Id*. (citations omitted).

Here, the TCCA described the proof as showing "that the victim's mother repeatedly called [Petitioner], that the calls were brief, that [Petitioner] responded to some inquiries and not to others, and that [Petitioner] ended some of the calls and then stopped answering his telephone when the victim's mother continued to call." *Id*. The court concluded that the evidence did not "preponderate against the trial court's findings that [Petitioner] willingly participated in

19

conversations with the victim's mother about the topics he chose to address and that he terminated the communications he desired." *Id.* The court further found that Petitioner made his statements voluntarily, and that the victim's mother did not overbear his will and coerce him into making the statements. *Id.*

The State-court's rejection of this claim is not unreasonable. The Fifth Amendment protects a person against self-incrimination. U.S. Const. amend. V. To be admitted into evidence, a defendant's statement or confession must have been made voluntarily. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004); *Dickerson v. United States*, 530 U.S. 428, 433 (2000). If the circumstances surrounding the confession are not such as to overbear the defendant's will, the statement is voluntary. *Dickerson*, 530 U.S. at 434 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Petitioner voluntarily made statements to the victim's mother, and the entire duration of the calls was less than four minutes [Doc. 19-2 p. 31]. In the phone calls, Petitioner demonstrated first a willingness to generally discuss the situation, and then an ability to choose to end the call by hanging up and thereafter refusing to answer the phone [*Id.* at 31-33]. The victim's mother did not threaten Petitioner, nor did she make any promises or offers in exchange for his statements [*Id.* at 32]. Therefore, the TCCA reasonably concluded that Petitioner's statements were made voluntarily and were not the result of pressure or coercion. This conclusion is not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of facts in light of the evidence presented. Relief is denied.

## C.     Sufficiency of the evidence

Petitioner argues that the evidence presented at his trial is legally insufficient to sustain his convictions for rape of a child, as the State did not present proof of penetration, and he was not

"on notice that he had to defend against some other elements other than penetration" [Doc. 1 p. 23-34].

A federal habeas petitioner can successfully challenge the sufficiency of the evidence only when the evidence, viewed in the light most favorable to the prosecution, is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In a federal habeas proceeding, such claims "are subject to two layers of judicial deference." *Coleman v. Johnson*, 556 U.S. 650, 651 (2012). "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [State-court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Parker*, 541 F.3d 652, 656 (6th Cir. 2008).

The TCCA applied *Jackson* to analyze Petitioner's claim, providing the following summary of proof of the offense:

> Viewed in the light most favorable to the State, the proof shows that as the victim watched television in the Defendant's bedroom, the Defendant entered the room, went under the sheets, and touched her "private" with his mouth. When asked by the victim's mother in a telephone call why he had done what the victim alleged, the Defendant stated that he had not meant to, that he gave in but should not have, that he was depressed, that he did not know why he did it, that it was horrible, and that he wished he were dead. The victim's grandmother testified that she spoke with the Defendant by telephone and that when she asked why he had done it, he stated that he did not know, that he had been depressed, that he was sorry, and that if the victim's family did not notify the police, he would leave town and they would never see him again. She also said he stated that he would rather die than go to jail, that he put his house on the market, and that he left town within three weeks to one month and was located in Michigan after having lived in Tennessee for thirty-three years.

*Love I*, 2017 WL 1077062, at *14. The court observed that cunnilingus is included in the statutory definition of sexual penetration. *Id.* at *15 (citing Tenn. Code Ann. § 39-13-501(7)). The court explained that "[i]n this sense, proof of cunnilingus is proof of sexual penetration, and additional proof of vaginal penetration is not required." *Id.* (citations omitted).

21

Tennessee law defines the rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" includes "cunnilingus." Tenn. Code Ann. § 39-13-501(7). At trial, the victim testified about an incident when she was in Petitioner's bed watching television when Petitioner entered the room, went under the sheets, and touched her "private" with his mouth [Doc. 19-6 p. 44-45]. She further testified regarding an incident where Petitioner touched her "private" with his finger and his mouth while she was sitting on the couch in his living room [*Id*. at 46]. The placement of Petitioner's mouth on the victim's genitals constituted cunnilingus, which satisfied the element of sexual penetration. *See Sanchez v. Phillips*, No. 2:19-cv-61, 2020 WL 291378, at *7 (M.D. Tenn. Jan. 21, 2020) (finding state court reasonably concluded that evidence sufficient to sustain conviction for rape of a child when proof showed defendant placed tongue on victim's vagina, even if he did not "place anything in it"). Therefore, the State-court's conclusion rejecting this claim is not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of facts in light of the evidence presented. Relief is denied.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V.      CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**


**IT IS SO ORDERED.**

ENTER:


_____
s/ Leon Jordan
United States District Judge